Revised December 1, 1998

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-31277
(Summary Calendar)
_____

SUSAN TAYLOR MARTIN,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
November 12, 1998

Before WIENER, BARKSDALE and EMILIO M. GARZA, Circuit Judges.

WIENER, Circuit Judge:

In this tax refund suit, Plaintiff-Appellant Susan Taylor Martin ("Susan") appeals the district court's order denying her motion for summary judgment and granting the cross-motion for summary judgment of Defendant-Appellee United States of America (the "government"). Concluding that the district court did not err in holding that Susan must recognize gain on the $5.75 million payment she received from Tenneco Gas Louisiana, Inc. ("Tenneco")[1] for the sale of her claims against her former husband's bankruptcy

_____

[1]Tenneco Gas Louisiana, Inc. is a subsidiary of Tenneco, Inc.

estate (the "Estate"), we affirm.

## I

## FACTS AND PROCEEDINGS

Ken Martin ("Ken") and Susan were married in 1958. At all relevant times they lived in Louisiana, and all property that they acquired while married was community property. In July, 1990, Susan and Ken separated; they obtained a legal separation in March, 1991,[2] and a divorce in September of that year.

In February, 1991, before Susan and Ken were legally separated and before they partitioned their community property, Ken filed for protection under Chapter 7 of the United States Bankruptcy Code. As a result, all community property became part of the Estate. Susan did not join in the bankruptcy petition, but filed two proofs of claim to protect her interests in the Estate.[3] Although Ken listed no assets in his bankruptcy petition, Susan asserted that

---

[2]Susan filed a petition for legal separation in August, 1990. Separation from bed and board was abolished by 1990 La. Acts, No. 1009, § 1 (eff. Jan. 1, 1991). See comment (c) to La. Civ. Code art. 101; La. R.S. 9:381-84. For cases arising prior to January, 1991, however, a judgment of separation terminates the community of acquets and gains existing between spouses under the community property regime. Termination is retroactive to the date of filing of the petition for separation. La. Civ. Code art. 2356 (amended 1990).

[3]Originally, Susan indicated that the premise of her claim was an "undivided ½ interest in debtor's community." On her amended proof, however, she also asserted "claims for fraud, bad faith management of the community, breach of debtor's fiduciary duty, and any and all other delictual, contractual and quasi-contractual claims."

the community owned valuable rights under a gas purchase contract.[4]

On July 1, 1993, Tenneco paid Susan $5.75 million for her claims against the Estate.[5] The following day, Tenneco and the bankruptcy trustee executed a settlement agreement pursuant to which Tenneco paid $7 million for an option to buy the Estate's rights and interests in the gas purchase contract.[6] The trustee reported this $7 million payment on the Estate's 1992 federal income tax return.

Susan timely filed her federal income tax return for calendar year 1993, and attached a Form 8275 in which she set forth her reasons why the $5.75 million she had received from Tenneco was not

---

[4]This contract existed between Martin Intrastate Gas Co. (MIG) —— a corporation formed by Ken —— and Louisiana Intrastate Gas Co. (LIG) —— another subsidiary of Tenneco, Inc. Tenneco entered into all of the agreements relevant to this matter. According to Plaintiff's Statement of Uncontested Material Facts, the contract required LIG to purchase from MIG large quantities of gas at a fixed price, which was (at all times pertinent to this case) quadruple the market price. Although Tenneco, Inc. later sold all of its interest in LIG, it became the indemnitor to and for LIG for all liability and performance under the contract.

[5]On July 9, 1993, the bankruptcy trustee filed a complaint asserting that the $5.75 million received by Susan from Tenneco was the property of the Estate. The bankruptcy court ruled against the Trustee, finding that Susan had sold only her interests as a claimant and not the actual "assets" of the Estate.

[6]The Estate thereby became solvent. On March 3, 1994, Tenneco and the bankruptcy trustee executed an amendment to the 1993 settlement agreement. This amendment —— approved by the bankruptcy court —— and the various releases executed pursuant to it (a) settled all outstanding claims each party had against all other parties in the various law suits over the gas purchase contract, and (b) effected a distribution of all the assets in the Estate. Pursuant to the amendment, Tenneco agreed to distributions by the trustee of all the property in the Estate —— including distributions to Ken —— without any distribution to itself in satisfaction of the claims it had acquired from Susan.

3

taxable. The government disagreed with Susan's analysis, and assessed a deficiency calculated by treating the entire payment as taxable income. In February, 1996, Susan paid the assessed taxes and interest, then filed an administrative claim for a refund. The following month, the government disallowed her refund claim.

Immediately following this disallowance, Susan filed suit in federal district court to recover the claimed refund. She then filed a Motion for Partial Summary Judgment on the issue of "what" she had sold to Tenneco in 1993. Susan asserted that she had sold only her claims against the Estate, not any assets of the Estate itself. The court agreed and granted her motion, and the government did not appeal.

Susan subsequently filed another motion for summary judgment in which she asserted that the payment from Tenneco should not be treated as taxable income. The government opposed Susan's motion, and filed a cross-motion for summary judgment which the district court granted. The court found that she had no basis in her claims against the Estate that she had sold to Tenneco and held that the entire $5.75 million she received as proceeds of that sale was taxable. Susan timely filed a notice of appeal.

**II**

**ANALYSIS**

A.  Standard of Review

We review a grant of summary judgment de novo, applying the

4

same standard as the District Court.[7]

B.   Applicable Law

Section 61(a) of the Internal Revenue Code ("IRC") provides that individuals shall be taxed on "all income from whatever source derived."[8]  "Accessions to wealth are generally presumed to be gross income unless the taxpayer can show that the accession falls within a specific exclusion.  Exclusions from income are to be construed narrowly."[9]

Susan contends that the payment from Tenneco should not be included in her gross income because it is either (1) an excludable distribution from the Estate pursuant to IRC § 1398(f)(2); or (2) an excludable payment in satisfaction of her inchoate marital rights pursuant to the rule of United States v. Davis.[10]

1.   IRC § 1398

Under the Bankruptcy Code, the commencement of either a

---

[7]Firesheets v. A.G. Bldg. Specialists, Inc., 134 F.3d 729, 730 (5th Cir. 1998).

[8]26 U.S.C. § 61(a).

[9]Wesson v. United States, 48 F.3d 894, 898 (5th Cir. 1995).  For federal income tax purposes, the amount of gain from a sale or other disposition of property is determined by subtracting the basis of the property (generally its cost, see 26 U.S.C. § 1012) from the amount realized on the sale (generally the selling price, see 26 U.S.C. § 1001(a) and (b)).  See Byram v. Commissioner, 555 F.2d 1234, 1236 (5th Cir. 1977). The entire amount of gain from the sale of property must be recognized by the taxpayer, unless the gain falls within a specific exclusion under the Internal Revenue Code.  See Wesson, 48 F.3d at 898.  Susan does not dispute the amount of gain on which she owes taxes, but rather whether she must recognize any gain at all.

[10]370 U.S. 65 (1962).

liquidation (Chapter 7) or a reorganization (Chapter 11) proceeding creates a bankruptcy estate comprising all property formerly belonging to the debtor.  Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case,"[11] as well as "[p]roceeds . . . or profits of or from property of the estate . . . ."[12]  IRC § 1398[13] treats the bankruptcy estate as a separate entity for tax purposes; the estate is taxed as if it were the debtor with respect to items of income to which the estate is entitled.[14]  Section 1398(f) provides that a "transfer (other than by sale or exchange) of an asset <u>from the debtor</u> to the [bankruptcy] estate"[15] — or "<u>from the estate</u> to the debtor" on termination of the estate[16] — "shall not be treated as a disposition for purposes of any provision of this title assigning tax consequences to a disposition . . . ."[17]

The district court held that § 1398(f)(2) was inapplicable to the facts of this case because (1) Susan was a nonfiling spouse

---

[11]11 U.S.C. § 541(a)(1).  It is pursuant to this provision that title to the Martin's unpartitioned community property vested in the bankruptcy trustee.

[12]11 U.S.C. § 541 (a)(6).

[13]26 U.S.C. § 1398.

[14]<u>In re Kochell</u>, 804 F.2d 84, 87 (7th Cir. 1986).

[15]26 U.S.C. § 1398(f)(1)(emphasis added).

[16]26 U.S.C. § 1398(f)(2)(emphasis added).

[17]26 U.S.C. § 1398(f).

rather than a "debtor"[18]; (2) there was no "transfer from the estate"; and (3) Susan did not receive any "asset" of the estate. We agree.

Susan contends, however, that, when all of her and Ken's unpartitioned community property was transferred to the bankruptcy estate, her ownership interest in that property was replaced —— by operation of law —— with a "claim," specifically, the right to receive a distribution from the sale of the Estate's assets.[19] As she was not required to recognize any gain on this initial transfer, Susan reasons, the government must have been treating her as a debtor for purposes of § 1398(f)(1). Consequently, Susan concludes, she should also be treated as a debtor for purposes of § 1398(f)(2), pertaining to transfers to a debtor from the bankruptcy estate. As a classic flawed syllogism, this argument fails.

Susan's assumption that § 1398(f)(1) applied to the transfer of her interest in the community property to the Estate is simply wrong. As the government correctly points out, § 1398(f)(1) merely states the general rule that a transfer that would otherwise constitute a taxable disposition is nontaxable when the transferor is the debtor and the transferee is the estate. Here, in exchange

---

[18]The Bankruptcy Code defines the term "debtor" as a "person or municipality concerning which a case under this title has been commenced." 11 U.S.C. § 101(13)

[19]11 U.S.C. § 726.

7

for her transfer to the Estate, Susan received only the right to a future distribution; she did not have an "accession to wealth" at that time. The transfer was not, therefore, a taxable disposition, even absent the application of § 1398(f)(1). Hence, the corollary proposition urged by Susan —— that she must be treated as a debtor for purposes § 1398(f)(2) —— is baseless.[20]

We also conclude that § 1398(f)(2) is inapplicable to the facts of this case, principally because Susan never received a transfer of an asset from the Estate on termination of the Estate. Susan argues that, even though the distribution came from Tenneco rather than from the bankruptcy trustee, the $5.75 million should be deemed to have been transferred from the Estate pursuant to the "origin of the claim" doctrine. Under this doctrine, Susan advances, the taxability of income depends on the nature and character of the claim from which the money is derived. She contends that, in this particular instance, she was entitled to a tax-free distribution from the Estate, and that the payment from Tenneco was, in fact, a substitute for this distribution.

---

[20]If she is not considered a debtor for purposes of § 1398(f)(2), contends Susan, then this section denies her the equal protection of the laws by treating filing and nonfiling spouses differently. Susan argues that she and Ken are similarly situated with respect to their community property interests, and that to make a distribution to one of them a nontaxable event while imposing tax on the other would be unconstitutional.

This argument is without merit. First, unlike Ken, Susan did not receive a "transfer" of "assets" from the bankruptcy estate on its "termination." In addition, unlike Ken, Susan retained a property interest in the community property even after it was transferred to the bankruptcy estate. She was, therefore, entitled to protect this interest by filing a claim against the estate. Consequently, the two are not similarly situated, and they need not be treated "equally" under the law.

8

Regardless of its immediate source, insists Susan, the payment should be treated no differently for tax purposes than one made directly from the Estate.

We are singularly unpersuaded by this argument. In support of her "origin of the claim" theory, Susan relies on cases in which courts have held that proceeds received "in lieu of" otherwise tax-exempt funds were themselves nontaxable.[21] In each of the cases cited, however, the taxpayer received proceeds from an adverse party in settlement of an underlying, disputed claim.[22] In the instant case, Susan's claims were not settled; she sold her claims

---

[21]See generally Lyeth v. Hoey, 305 U.S. 188 (1938)(holding that an heir who contested his grandmother's will and who, as a result of a compromise of that contest, received property from the grandmother's estate which he would not have received had the will gone uncontested, acquired that property "by bequest, devise, or inheritance," and was therefore not liable for federal income taxes); Early v. Commissioner, 445 F.2d 166 (5th Cir. 1971)(holding that an agreement between taxpayers and heirs of decedent — pursuant to which taxpayers received a joint life interest in income from the trust estate in return for the surrender of stock allegedly gifted to them by the decedent — was actually a compromise of the taxpayers' disputed right to the stock, and since they claimed the stock as donees, they were to be treated as having acquired their life estate in that capacity for federal income tax purposes).

[22]Susan relies on Estate of Longino v. Commissioner, 32 T.C. 904 (1959) for the proposition that the origin of the claim doctrine can also be used to determine the taxability of proceeds received from third parties. In Longino, the taxpayers' cotton crop was destroyed through their use of a pesticide distributed by United Cooperatives, Inc. Taxpayers filed suit for damages against United and others who had had anything to do with the product. Taxpayers settled their claim with United for a payment of $21,087.60 from United's insurer. Because the insurer desired to preserve United's rights against the manufacturer and others, the settlement was handled by an assignment of taxpayers' claim in exchange for the settlement sum. The court held that, because the payment clearly represented damages for loss of profits — and not proceeds from a sale — the amount was taxable as ordinary income. Id. at 905-06. The holding in Longino is clearly inapposite to the instant case, in which Tenneco paid Susan $5.75 million for her claims against Ken's Estate, and not in settlement of those claims.

9

against Ken's estate to Tenneco for a $5.75 million payment. This payment did not operate to extinguish her underlying claims against the Estate; rather, it expressly transferred her claims to Tenneco. Consequently, regardless of whether Susan might have thought subjectively that this payment was in settlement of her claims —— in lieu of a tax-free Estate distribution —— the fact is inescapable that the $5.75 million payment is the proceeds of the sale of her unextinguished claims. Tenneco merely stepped into her shoes as claimant. In essence, Susan consciously chose to liquidate an asset —— her claims against the Estate —— by selling them for cash to a third party rather than retaining her claims and pursuing them at the risk of recovering less (or nothing) and at the expense of the time value of the money.

In addition, because the payment came from Tenneco rather than from the Estate, Susan obviously did not receive an "asset from the estate" as required under § 1398(f)(2). And, finally, there is the element of timing: Susan received the payment from Tenneco almost a year <u>before</u> distributions of the Estate's assets were made. Receipt of the payment prior to termination of the Estate is another reason why § 1398(f)(2) is not applicable.

2. <u>Transfer in Satisfaction of Inchoate Marital Rights</u>

In the district court, Susan also argued that the $5.75 million was exempt from tax under IRC § 1041. Section 1041 provides that property received from a former spouse incident to divorce is excluded from the recipient's gross income. The

10

recipient's basis is equal to the transferor's basis, and the recognition of any gain or loss is deferred until the recipient transfers the property to a third party.[23]  The district court rejected the applicability of § 1041 to the facts of this case, and Susan does not raise this argument again on appeal, thereby waiving it.  On appeal, she relies instead on United States v. Davis,[24] which governed the transfer of property in satisfaction of marital rights prior to the 1984 enactment of § 1041.

The Martins were divorced in 1991.  Nevertheless, Susan argues that "[w]here § 1041 fails to apply and the Code does not provide substitute tax treatment, the tax treatment presumably is determined by common law doctrines — e.g., the Davis rule and, potentially, the assignment of income doctrine."[25]

Specifically, Susan asserts that Ken's filing of a bankruptcy petition converted her undivided one-half ownership interest in their community property into an inchoate interest in the Estate. Susan maintains that Ken had a legal obligation to reimburse her for her share of the marital assets.  Had the payment come from her

---

[23]Arnes v. United States, 981 F.2d 456, 458 (9th Cir. 1992).

[24]Davis involved the transfer of appreciated stock by a husband to his former wife pursuant to a divorce decree in satisfaction of the wife's inchoate marital rights.  The Supreme Court held that this transfer was a taxable event, that the value of the property received by the husband (the release of the wife's inchoate marital rights) was equal to the fair market value of the stock, and that the husband must recognize gain on the transfer.  The Court further held that the market value of the stock should be taken by the wife as her tax basis.  370 U.S. at 72-3.

[25]Quoting Cindy L. Wofford, "Divorce and Separation," 515 T.M. PORTFOLIOS, p. A-21 (BNA 1995).

11

former husband in exchange for the release of this obligation, contends Susan, then, under <u>Davis</u>, he would be taxed on the gain, and she would take a basis equal to the face value of the cash distribution — $5.75 million.

In <u>Davis</u>, the Supreme Court assumed "that the parties acted at arm's length and that they judged the marital rights to be equal in value to the property for which they were exchanged."[26] As such, "the market value of the property transferred by the husband" was taken by the wife "as her tax basis for the property received."[27] Under the facts of this case, argues Susan, because the only asset available for distribution was cash, her tax basis is the face value of the payment she received. The fact that the payment came from Tenneco rather than from Ken, insists Susan, should not alter the tax consequences.

The district court rejected this argument, and so do we. Unlike the husband in <u>Davis</u>, Ken never transferred anything to Susan in discharge of his marital obligation. Instead, Susan accepted a cash payment from Tenneco in exchange for her claims against the Estate, almost a year before any distributions were made from the trustee and almost two years after her divorce. Had she waited for and received a distribution from the Estate, she might have been entitled to treat such distribution as a nontaxable

---

[26]370 U.S. at 72.

[27]<u>Id.</u> at 73.

12

payment incident to divorce, pursuant to IRC § 1041. As it stands, however, the transaction between Susan and Tenneco can be characterized as nothing other than a garden variety sale on which Susan recognized substantial and immediate gain.

The government takes the position that Tenneco purchased Susan's claims to limit its liability to her under the gas purchase contract. The fact that Ken or the Estate ultimately might have benefitted from this transaction, contends the government, is irrelevant. We agree. Despite Susan's attempt to convince us otherwise, the facts that the payment came to her from Tenneco and not Ken, that her claims were not satisfied or extinguished but continued to exist in the hands of the purchaser, and that she was paid long before distributions were made by the Estate, have everything to do with the taxability of her payment. The government aptly notes that there is no evidence that Tenneco's payment was made at Ken's behest or that of his bankruptcy trustee, in exchange for a release of the claims under the gas purchase contract. Neither did Tenneco contract to buy Susan's claims against the Estate out of any concern for Ken or his marital property obligations. Susan's reliance on the <u>Davis</u> rule is wholly misplaced.

### III

### CONCLUSION

Susan has failed to demonstrate that the payment she received

from Tenneco was excludable from her gross income either as a distribution from the Estate under § 1398(f)(2), or in satisfaction of her inchoate marital rights under <u>Davis</u>. Consequently, she must recognize gain on that transaction. And, as Susan has failed to establish any tax basis in her claims against the Estate, the gain that she must recognize is on the entire amount of the payment she received from the sale of these claims to Tenneco. The district court did not err in holding the entire $5.75 million taxable and denying Susan's claim for a refund of the taxes she paid on the transaction. For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.